UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MSC.SOFTWARE CORPORATION,

        Plaintiff,

v.

ALTAIR ENGINEERING, INC., MARC
KLINGER, ANDREA PERTOSA, STEPHAN
KOERNER, TOM RIEDEMAN, RAJIV RAMPALLI
MARK KRUEGER, and MICHAEL HOFFMANN,

        Defendants.
_____/

**\*\*FILED UNDER SEAL\*\***

CASE NUMBER: 07-12807
HONORABLE VICTORIA A. ROBERTS

**ORDER REGARDING MOTIONS TO EXCLUDE THE
REPORTS AND TESTIMONY OF EXPERT WITNESSES
DOCS. # 698, 702, 704, 705, and 711**

**I.   INTRODUCTION**

Before the Court are five motions to exclude expert reports and testimony.  The motions are fully briefed; the Court waives oral argument under L.R. 7.1(e)(2).

The Court orders:

(1) MSC's Daubert Motion to Exclude the Expert Testimony of James McInerney (Doc. # 698) is **MOOT**;

(2) Altair and Rampalli's Daubert Motion to Exclude the Report and Testimony of R. Bruce Den Uyl (Doc. # 702) is **GRANTED**.  Additionally, the report and testimony of Robert J. Rock, CPA – MSC's expert who was first disclosed in its response to the Den Uyl motion – are excluded;

(3) MSC's Motion in Limine to Exclude the Expert Report and Testimony of James Schmid (Doc. # 704) is **DENIED**;

(4) Altair's Motion in Limine to Exclude the Expert Report and Testimony of William S. Choi, Ph.D. (Doc. # 711) is **GRANTED**; and

(5) MSC's Motion in Limine to Exclude the Expert Report and Testimony of Linda Petzold, Ph.D. (Doc. #705) is **GRANTED IN PART** and **DENIED**

**IN PART**. Dr. Petzold can testify regarding whether TTS 1, Mu = 0, is publicly known or reasonably ascertainable from publicly available information; she cannot testify regarding Altair's source code or whether Altair misappropriated TTS 1 – beyond stating that TTS 1 is publicly available or reasonably ascertainable from public information.

## II. STANDARD OF REVIEW

Federal Rule of Evidence 702 and *Daubert* guide determination of the sufficiency of expert testimony. Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702; *see also Flanagan v. Altria Group, Inc.*, 423 F. Supp. 2d 697, 700 (E.D. Mich. 2005).

In *Daubert*, the Supreme Court provided a framework for evaluation of expert testimony's compliance with Rule 702. Expert opinion must be both relevant and reliable. *Daubert*, 509 U.S. at 597. The relevance inquiry ensures "that 'there is a 'fit' between the testimony and the issue to be resolved by the trial.'" *Greenwell v. Boatwright*, 184 F.3d 492, 496 (6th Cir. 1999) (citing *United States v. Bonds*, 12 F.3d 540, 555 (6th Cir. 1993)).

"Expert testimony is relevant . . . when it will assist the trier of fact in understanding the evidence or determining a material fact in question." *Flanagan*, 423 F. Supp. 2d at 699 (citing *Daubert*, 509 U.S. at 592-93). But, "[e]ven if the Court finds the evidence reliable and relevant, it must also determine whether its probative value is outweighed by its prejudicial effect" under Fed. R. Evid. 403. *Flanagan*, 423 F. Supp. 2d at 699 (citing *Daubert*, 509 U.S. at 595).

The reliability step focuses on the methodology and principles that form the basis for the testimony. *Greenwell*, 184 F.3d at 497 (citing *Bonds*, 12 F.3d at 556). *Daubert* sets forth four criteria to assist trial courts in making a preliminary evaluation on the admissibility of expert testimony:

> (1) whether a theory or technique has been or can be tested;
> (2) whether the technique has been subjected to peer review and publication;
> (3) the known or potential rate of error; and
> (4) whether the technique has been accepted by the 'relevant scientific community,' or 'has been able to attract only minimal support within the community.'

*Daubert,* 509 U.S. at 593-94; *Gross v. Comm'r of Internal Rev.*, 272 F.3d 333, 339 (6th Cir. 2001);

"The test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire. Co. v. Carmichael*, 526 U.S. 137, 141-42 (1999). "[T]he factors it mentions do not constitute a 'definitive checklist or test'"; they "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Daubert*, 509 U.S. at 151; *Kumho*, 526 U.S. at 150. "*Daubert's* general holding . . . applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho*, 526 U.S. at 141.

When evaluating expert testimony, "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at

3

595. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596 (citation omitted)

At the same time:

> [C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (citing *Turpin v. Merrell Dow Pharm., Inc.*, 959 F.2d 1349, 1360 (6th Cir. 1992)).

Lastly, "[t]he party offering expert testimony must prove its admissibility by a preponderance of the evidence." *Flanagan*, 423 F. Supp. 2d at 699 (citing *Daubert*, 509 U.S. at 592, n.10).

### III. ANALYSIS

#### A. MSC's Motion to exclude the Report and Testimony of James McInerney (Doc. # 698)

MSC asks the Court to exclude the expert testimony of James McInerney (McInerney). On January 21, 2014, Defendants filed a response stating that McInerney's testimony would only confirm facts that are essentially undisputed and that they will no longer call him as a witness. Because Defendants removed McInerney from their witness list, MSC's Daubert Motion to Exclude the Expert Testimony of James McInerney (Doc. # 698) is MOOT.

#### B. Altair and Rampalli's Motion to Exclude the Report and Testimony of R. Bruce Den Uyl (Doc. # 702) and MSC's Motion to Exclude the

4

**Report and Testimony of James Schmid (Doc. # 704)**

Both MSC and Defendants retained experts to testify regarding the amount of damages for Count III, Misappropriation of Trade Secrets. MSC retained R. Bruce Den Uyl (Den Uyl); Defendants retained James Schmid (Schmid). MSC and Defendants each ask the Court to exclude the report and testimony of the opposing expert.

      **i.    Altair's Software**

To understand the methodologies each expert uses to calculate damages, the Court must explain Altair's software programs. The misappropriation of trade secrets claim is based on technical trade secrets (TTSs) which MSC alleges are in Altair's software called MotionSolve. MotionSolve is one of dozens of separate, stand-alone software programs that are made available through a suite called HyperWorks.

Users of HyperWorks acquire a license to HyperWorks suite as a whole from Altair by purchasing "HyperWorks Units," or "tokens," that are good for a pre-set time period – usually one year. Licensees can purchase various amounts of tokens. During the life of the license, the tokens can be used to gain access to the different software programs within the HyperWorks suite, provided the user purchased enough tokens for a particular product.

Different amounts of tokens are required to access each particular software program within HyperWorks. The number of tokens required to use a particular program is considered that program's "token draw"; for example, the token draw for MotionSolve in 2009 was 3,800 tokens; the total tokens for all software programs forming HyperWorks that year was approximately 36,000. According to Altair's Rule 30(b)(6) witness, token draw requirements are not set based on customer usage, but

5

rather on customers' "perceived value of the product."

Another facet of the HyperWorks suite is the Partner Alliance program, in which Altair hosts stand-alone software programs from other companies (Partners) and licenses them to its customers who have access to HyperWorks; there are approximately 25 Partner companies. Customers gain access to Partner products by using the same HyperWorks tokens as other products within the suite. In order for Altair to determine Partner compensation, Altair tracks usage of Partner software; any HyperWorks user seeking to use Partner products must agree to allow Altair to track their usage of each program in the HyperWorks suite. The usage data is collected using the same methodology for each HyperWorks program, whether it is an Altair program or Partner program; Altair tracks usage based on minutes used on each program. In 2012, approximately 46% of all HyperWorks customers reported usage; in 2011 and 2010, respectively, approximately 42% and 27% of HyperWorks users reported (Reporting Customers).

### ii. Reasonable Royalty

Both Den Uyl and Schmid use a reasonable royalty theory to calculate damages. Calculating a reasonable royalty involves: (1) determining the base revenue/royalty base; (2) determining the reasonable royalty rate; and (3) multiplying the base revenue by the royalty rate. Calculation of damages based on a reasonable royalty "depends on trustworthy evidence of both the royalty base and the royalty rate." *IP Innovation LLC v. Red Hat, Inc.*, 705 F. Supp. 2d 687, 689 (E.D. Tex. 2010).

"Royalties are dependent on the level of sales or usage by the licensee." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1326 (Fed. Cir. 2009). The reasonable

royalty rate is "applied to the *actual* sales or use of the infringing product," i.e., royalty base. *Nilssen v. Motorola, Inc.*, 1998 WL 851493, at *3 (N.D. Ill. 1998) (emphasis in original). The parties agree that the proper royalty base is the revenue of MotionSolve. Therefore, to determine the royalty base, the experts must use the sales or usage of MotionSolve. *See id.*; *Lucent Techs.*, 580 F.3d at 1326.

As explained, MotionSolve is one of many software programs in HyperWorks, and customers who purchase tokens can use any program whose token draw is equal to or below the number of tokens purchased; additionally, no data exists showing MotionSolve's sales or all MotionSolve usage. Thus, it is impossible to determine the *actual* revenue of MotionSolve. Because there is no way to determine MotionSolve's actual revenue, both experts attempt to calculate the royalty base/base revenue by determining the percentage of HyperWorks revenue (which is 90% of Altair's total revenue) that MotionSolve represents; Den Uyl and Schmid use different methods to calculate royalty base.

### iii. Den Uyl's Methodology

Den Uyl says that he "provide[s] a royalty calculation based on the limited data produced by Altair ... using a range of assumptions as to MotionSolve-related revenue as a percentage of total HyperWorks software revenue."

Defendants challenge the reliability of Den Uyl's reasonable royalty calculation; specifically, they say the method he used to calculate royalty base is unreliable, and his royalty rate is unsupported.

### a. Expert Report of Robert J. Rock, CPA

As a preliminary matter, the Court must address whether MSC may rely on the report and testimony of an untimely disclosed expert, Robert J. Rock, CPA (Rock). MSC first disclosed this expert on January 15, 2014, in response to Defendants' motion to exclude the expert report and testimony of Den Uyl; it proposes to use Rock to bolster Den Uyl's methodology as well as to rebut Schmid's criticism of Den Uyl's report. For the same reason as Dr. Choi, discussed *infra*, the Court precludes MSC from presenting Rock's report or testimony. See Fed. R. Civ. P. 26(a)(2)(D)(ii) and 37(c)(1).

### b. Den Uyl's Royalty Base

Den Uyl calculates royalty base by finding the percentage of tokens required to use MotionSolve relative to the total tokens for all software forming HyperWorks; i.e., MotionSolve token draw *divided by* amount of tokens to use all HyperWorks programs. The number of tokens required to use MotionSolve varied from year-to-year, as did the amount of tokens required to use all HyperWorks programs; accordingly, MotionSolve's relative token draw percentage varied.

Because the token amounts varied, Den Uyl found that the appropriate royalty base was a range of bases from 5% to 20%. He based that range on three different findings: (1) in 2009, 3,800 tokens were needed to use MotionSolve and 36,000 tokens were needed for all of HyperWorks, so MotionSolve represented 11% of the total tokens; (2) in 2013, 2,500 tokens were needed to use MotionSolve, which represented 7% of the tokens for all of HyperWorks; and (3) MSC also uses a token system where the ADAMS/Solver product represents approximately 14% of MSC's total software system (22% if combined with ADAMS/View).

Defendants says Den Uyl's method of calculating royalty base is not reliable,

does not comport with generally accepted accounting principles (GAAP), in no way approximates actual revenue or actual usage, and is unhelpful to the jury. Specifically, they say Den Uyl's calculation of royalty base is unreliable because: (1) it is not based on sales or usage; (2) he does not explain how the token draw required to use MotionSolve relative to the total amount of tokens to use all of HyperWorks relates to MotionSolve's revenue; and (3) he fails to support his finding that MotionSolve revenue makes up 5% to 20% of HyperWorks revenue.

"Royalties are dependent on the level of sales or usage." *Lucent Techs.*, 580 F.3d at 1326. Despite this fact, Den Uyl admits that he based his royalty calculation on neither sales nor usage; he blames this on Altair for not providing enough data. However, this is unavailing to Den Uyl and MSC; it must still show that Den Uyl's methodology satisfies *Daubert* and Fed. R. Evid. 702. *See Flanagan*, 423 F. Supp. 2d at 699 (citing *Daubert*, 509 U.S. at 592, n.10) ("party offering expert testimony must prove its admissibility by a preponderance of the evidence"). Den Uyl's methodology fails the second and third Rule 702 requirements – i.e., that his opinions be a product of reliable principles and methods and that he applied the principles and methods reliably to the facts of the case.

Den Uyl summarily states that "[g]iven Altair's data production, the relative weighting data discussed above is the best data available regarding MotionSolve revenue and is the basis for my assumption range." Defendants correctly point out that "Den Uyl cites no authority, no case law, no GAAP, other standards, or articles for this novel theory." Den Uyl's self-serving, conclusory statement regarding the superiority of his base revenue calculation method is insufficient to show that his methodology is

9

reliable; indeed, "to be admissible, an expert's opinion must be supported by 'more than subjective belief and unsupported speculation' and should be supported by 'good grounds, based on what is known.'" *Pomella v. Regency Coach Lines, Ltd.*, 899 F. Supp. 335, 342 (1995) (quoting *Daubert*, 509 U.S. at 590).

Den Uyl also fails to explain how the MotionSolve token draw relative to all HyperWorks tokens relates to, or would be an accurate indicator of, MotionSolve revenue. All he says is that the "token draw for the HyperWorks subcomponents ... is 'analogous to setting a commercial list price for the product,' [which] suggests that the token prices are an indication of the relative value placed on the subcomponent products by Altair." Den Uyl does not, however, explain how value relates to revenue or provide any support showing that it does. Defendants correctly say that "Den Uyl's methodology produces the identical conclusion whether the facts revealed zero, all, few, or the majority of HyperWorks' customers bought tokens and used them for MotionSolve." Based on these unexplained flaws, the Court "conclude[s] that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146 (citing *Turpin*, 959 F.2d at 1360).

After reviewing his reports, the Court finds that Den Uyl's "testimony is [not] the product of reliable principles and methods," and he did not apply "the principles and methods reliably to the facts of the case. Fed. R. Evid. 702. Accordingly, the Court excludes Den Uyl's report and testimony regarding damages in the form of a reasonable royalty.

### c. Den Uyl's Royalty Rate

Den Uyl concludes that a reasonable royalty rate would be at least 50% of

Altair's revenue associated with MotionSolve. He arrived at that rate by reviewing 11 actual licensing transactions to which MSC was a party. Den Uyl also assessed the relative bargaining strengths of the parties' negotiating position at the time of the alleged misappropriations, including the fact that MSC and Altair are direct competitors.

Defendants say Den Uyl's calculation of royalty rate is unreliable because: (1) it has remained at 50% since 2009 – when 50 TTSs were at issue; (2) the licensing transactions he relies on do not support a 50% rate; and (3) he fails to show the license agreements used as comparables contain the same or similar trade secrets as the alleged misappropriated technology.

The Court has already determined that Den Uyl's unreliable methodology in calculating royalty base excludes his report and testimony regarding damages based on a reasonable royalty; accordingly, the Court need not analyze the reliability of Den Uyl's calculation of a reasonable royalty rate.

Altair and Rampalli's Daubert Motion to Exclude the Report and Testimony of R. Bruce Den Uyl (Doc. # 702) is **GRANTED**. Additionally, the report and testimony of Robert J. Rock, CPA – MSC's expert who was first disclosed in its response to the Den Uyl motion – are excluded;

        **iv.**     **Schmid's Methodology**

Because MSC only challenges Schmid's calculation of royalty base/base revenue, the Court need not examine Schmid's calculation of royalty rate. Schmid calculates base revenue based on MotionSolve usage; the data showing MotionSolve usage is limited to the Reporting Customers.

To calculate base revenue, Schmid started by determining the total HyperWorks revenue – 90% of Altair's total revenue. Next, he computed the percent of total HyperWorks usage attributable to MotionSolve usage for the Reporting Customers; he did this by dividing the total amount of minutes all Reporting Customers used on MotionSolve during the year by the total amount of minutes Reporting Customers used on all HyperWorks programs during the year. Lastly, Schmid applied the MotionSolve usage percentage for the Reporting Customers to total HyperWorks revenue for that year.

MSC says Schmid's report is not reliable because his calculation of MotionSolve's base revenue was based on the usage of only the Reporting Customers, which, at most, consisted of 46% of all HyperWorks users. Specifically, MSC says Schmid's methodology is unreliable because: (1) no evidence supports his assumption that non-reporting customers use MotionSolve as much, or as little, as Reporting Customers; (2) he erred in assuming that the Reporting Customers constitute a sufficiently representative sample of all HyperWorks customers upon which he could draw reliable conclusions regarding MotionSolve usage by all users; (3) he improperly concluded that the "average size" of the reporting and non-reporting Customers, by itself, was sufficient to compare the two subgroups; and (4) there is sample bias.

The method Schmid used to calculating base revenue – *usage* of MotionSolve relative to usage of all HyperWorks programs – is recognized as an acceptable methodology in determining a reasonable royalty. *See Lucent Techs.*, 580 F.3d at 1326 ("Royalties are dependent on the level of sales or usage by the licensee."); *Nilssen*, 1998 WL 851493, at *3 (finding that to calculate a reasonable royalty, the royalty rate is

"applied to the *actual* ... use of the infringing product") (emphasis in original). It is also accepted by approximately 25 other companies; Altair has consistently applied this method in calculating its Partner revenue for over three years.

In addition, Schmid conducted several exercises to test the reliability of his methodology and assumptions; for example, he: (1) confirmed that his methodology was the same used with, and trusted by, the Partners; (2) made sure the Reporting Customers represented a material number of total HyperWorks users; (3) interviewed Altair employees to make sure that certain large non-reporting customers (e.g., Ford, GM, Chrysler) were not users of MotionSolve; and (4) made sure the relative size of the Reporting Customers and non-reporting customers was the same by calculating the average revenue received from Reporting Customers and non-reporting customers.

The Court finds that Schmid based his report on sufficient facts and data, he used reliable methods in making his report, and he applied those methods reliably to the facts and data. *See Lucent Techs.*, 580 F.3d at 1326; *Nilssen*, 1998 WL 851493, at *3.

All the alleged weaknesses MSC raises regarding Schmid's calculation go to the weight to attach to, not the admissibility of, his report and testimony, which is a question for the jury. *See A&M Records, Inc. v. Napster, Inc.*, 2000 WL 1170106, at *3-4 (N.D. Cal. 2000). MSC may attack the alleged flaws through cross-examination and the presentation of contrary evidence. *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Accordingly, Schmid's report and testimony are admissible.

MSC's Motion in Limine to Exclude the Expert Report and Testimony of James

Schmid (Doc. # 704) is DENIED.

### C. Defendants' Motion to Exclude the Report and Testimony of William S. Choi, Ph.D. (Doc. # 711)

Defendants move to exclude the report and testimony of William S. Choi, Ph.D., an expert in sampling and statistical analysis, for being untimely disclosed. MSC disclosed Dr. Choi's report on January 9, 2014, in their motion to exclude the report and testimony of Schmid; it offers his testimony to rebut Schmid's use of the usage data in calculating reasonable royalty damages for its misappropriation of trade secrets claim.

Defendants say MSC cannot use the report and opinion of Dr. Choi to support its motion, because its disclosure of him as an expert was not timely under Fed. R. Civ. P. 37(c)(1). The pertinent part of Rule 37 provides that:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence *on a motion*, at a hearing, or *at a trial*, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1) (emphasis added). The Court agrees.

If a party intends to call an expert solely to rebut opposing evidence on the same subject matter, the disclosure of that expert "must be made ... within 30 days after the other party's disclosure." Fed. R. Civ. P. 26(a)(2)(D)(ii). Schmid's report was served on October 14, 2013; his deposition was on November 26, 2013. MSC says "[i]t was not until Mr. Schmid was deposed ... that he attempted ... to offer a cogent opinion regarding the Usage Samples as a statistically reliable sample...." Accordingly, MSC says, the 30 days did not begin until November 26, 2013. Notwithstanding whether the period began on November 26 or October 14, MSC did not disclose Dr. Choi as an expert within 30 days of either date.

14

Alternatively, MSC says it should still be able to use Dr. Choi to rebut Schmid, because its failure to provide a timely disclosure "was substantially justified" and "is harmless." *See* Rule 37(c)(1). The Court disagrees. MSC offers no reason that substantially justifies its failure to disclose Dr. Choi's expert report within the 30-day time period. In addition, the untimely disclosure is not harmless; MSC's disclosure occurred only one month before trial begins. Admitting evidence from such a late disclosure would prejudice Defendants trial preparation, their ability to challenge Dr. Choi's report, and their ability to provide their own rebuttal witness regarding sampling and statistical analysis. Accordingly, Dr. Choi's report and testimony are excluded from evidence.

Defendants' Motion in Limine to Exclude the Expert Report and Testimony of William S. Choi, Ph.D. (Doc # 711) is GRANTED.

### D. MSC's Motion to Exclude the Report and Testimony of Linda Petzold, Ph.D. (Doc. # 705)

MSC moves to exclude the report and testimony of Linda Petzold, Ph.D. (Dr. Petzold). Dr. Petzold is Defendants' technical expert who will testify that $Mu = 0$ – which is MSC's alleged TTS 1 in its misappropriation claim – is publicly available, and therefore not a trade secret.

To prepare her report, Dr. Petzold "reviewed the documents provided by counsel, surveyed literature in the field as needed, read publicly available documents, reviewed Altair source code as well as publicly available source code, and applied [her] own knowledge and professional experience." Dr. Petzold admits that she did not read MSC's source code to review TTS 1; rather, she relied on the description of the trade

15

secrets in the April 2009 Templates. In her report, Dr. Petzold concludes that the April 2009 template for TTS 1, Mu = 0, "describes an implementation that is publicly known or reasonably ascertainable from academic literature and other publicly available information," and that this TTS is "common sense."

MSC says Dr. Petzold's opinions are unreliable for the following reasons: (1) Altair's code is written in C++ computing language, which is a language she admits she cannot write or design and that she can only read "to an extent"; (2) her opinion is not based on sufficient facts; and (3) because she cannot read Altair's C++ code fluently, and because she did not base her opinion on sufficient facts, she cannot reliably say whether Altair misappropriated TTS 1. To be able to reliably conclude that there was no misappropriation, MSC says Dr. Petzold had to read MSC's source code and review MotionSolve's development history. *See Autotech Tech. Ltd. P'Ship v. Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006) ) (finding that an expert who is analyzing whether the features of one software program could be developed independently of another software program "should, at a minimum, examine the product and software upon which the expert bases his opinion.")

MSC appropriately asks the Court to exclude Dr. Petzold from testifying as to whether Altair "misappropriated TTS 1." Because she did not read MSC's source code or review MotionSolve's development history, and because she cannot read C++ fluently, Dr. Petzold cannot reliably testify regarding whether Altair misappropriated TTS 1. *See id.*

But, whether Dr. Petzold can reliably testify that TTS 1 is publicly available or reasonably ascertainable from public information – and, thus, not a trade secret, is a

16

different issue.

Altair says Dr. Petzold was not required to review the Altair and MSC source code, or their development histories, because: (1) the Court has already found that the TTS descriptions in the April 2009 Templates provide a "clear, complete and binding list of all trade secrets MSC claims are at issue"; and (2) "[t]he threshold issue considered by Dr. Petzold as to TTS 1 is whether it meets the MUTSA definition of a trade secret by being publicly known or reasonably ascertainable. It is only after MSC has proven that TTS 1 is not publicly known or reasonably ascertainable that the question of when and why it was implemented into the Altair code becomes relevant." MSC acknowledges that this analysis is different from misappropriation analysis, and admits that "Dr. Petzold limited her 'analysis' to whether TTS 1 is a secret."

As Altair points out, Dr. Petzold only had to look at TTS 1 and determine whether $Mu = 0$ is publicly available or reasonably ascertainable from information made publicly available. To do so, she did not have to read MSC's source code, read MotionSolve's development history, or be fluent in C++ code. Reading the TTS descriptions in the April 2009 Templates, reviewing publicly available literature in the field and other public documents, and reviewing public source code, along with the application of her extensive and unchallenged qualifications in the relevant field, was sufficient for her to reliably conclude that TTS 1 is publicly available or reasonably ascertainable from information publicly available, and thus TTS 1 is not a trade secret. *See* Fed. R. Evid. 702, advisory committee note (2000) ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."). Because Dr. Petzold's review was solely to determine whether TTS was publicly available and not a secret, her

method was reliable. Accordingly, Dr. Petzold may testify to this conclusion.

MSC's motion to exclude the report and testimony of Dr. Petzold (Doc. # 705) is GRANTED IN PART and DENIED IN PART.

## IV.   CONCLUSION

The Court orders:

(1) MSC's Daubert Motion to Exclude the Expert Testimony of James McInerney (Doc. # 698) is **MOOT**;

(2) Altair and Rampalli's Daubert Motion to Exclude the Report and Testimony of R. Bruce Den Uyl (Doc. # 702) is **GRANTED**.  Additionally, the report and testimony of Robert J. Rock, CPA – MSC's expert who was first disclosed in its response to the Den Uyl motion – are excluded;

(3) MSC's Motion in Limine to Exclude the Expert Report and Testimony of James Schmid (Doc. # 704) is **DENIED**;

(4) Altair's Motion in Limine to Exclude the Expert Report and Testimony of William S. Choi, Ph.D. (Doc. # 711) is **GRANTED**; and

(5) MSC's Motion in Limine to Exclude the Expert Report and Testimony of Linda Petzold, Ph.D. (Doc. #705) is **GRANTED IN PART** and **DENIED IN PART**. Dr. Petzold can testify regarding whether TTS 1, Mu = 0, is publicly known or reasonably ascertainable from publicly available information; she cannot testify regarding Altair's source code or whether Altair misappropriated TTS 1 – beyond stating that TTS 1 is publicly available or reasonably ascertainable from public information.

**IT IS ORDERED**.

                                                            S/Victoria A. Roberts
                                                            Victoria A. Roberts
                                                            United States District Judge

Dated: January 27, 2014

| |
|---|
| The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on January 27, 2014.<br><br>s/Linda Vertriest<br>Deputy Clerk |