UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION



SEP 2 3 2014

CLERK'S OFFICE
U.S. DISTRICT COURT
EASTERN MICHIGAN

MSC.SOFTWARE CORPORATION,

      Plaintiff,

                                        Case No. 2:07-cv-12807

v.

ALTAIR ENGINEERING, INC.,                  HON. AVERN COHN
MARC KLINGER, RAJIV RAMPALLI,
and MICHAEL HOFFMANN,

      Defendants.

_____/

## MEMORANDUM AND ORDER
## DENYING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ON MSC's NON-SOLICITATION CLAIMS (Doc. 827)

### I. Introduction

This is a business dispute tried to a jury. Relevant to the captioned motion, the jury found in favor of plaintiff MSC.Software Corporation (MSC) on its claims against defendants Marc Klinger (Klinger) and Rajiv Rampalli (Rampalli) for breach of the non-solicitation clauses in their employment contract and against defendant Altair Engineering, Inc. (Altair) and on its related claim of tortious interference with Klinger and Rampalli's employment contracts. The jury awarded damages as follows:

    Rampalli/Altair - $175,000.00 (92% attributable to Altair, 8% attributable to Rampalli

    Klinger/Altair - $250,000 (90% attributable to Altair, 10% attributable to Klinger

    Before the Court is Altair, Rampalli and Klinger's renewed motion for judgment

as a matter of law on MSC's non-solicitation claims.[1]  For the reasons that follow, the

motion will be denied.

## II. Overview

Altair[2] raises four arguments as grounds for reversing the jury's verdict.  First, it

argues that the non-solicitation clauses are void as a matter of California law and

therefore MSC cannot enforce the contracts or hold Altair liable for tortiously interfering

with them.  As will be explained, however, the controlling law clearly holds that

non-solicitation clauses are valid and enforceable under the circumstances displayed at

trial.  Second, Altair argues that MSC failed to satisfy the elements of its tortious

interference claim against Altair.  This argument does not carry the day because the

evidence at trial, viewed in a light most favorable to MSC, establishes Altair's liability.

Third, they argue that certain claims dismissed before trial were improperly reinstated.

This argument fails because Altair had ample notice and an opportunity to be heard on

these claims.  Finally, Altair argues that MSC could not recover anything but nominal

damages on Counts II and IV because the employment contracts at issue were "at will."

Altair, Rampalli and Klinger are not entitled to a new trial because MSC presented the

jury with a tangible basis for its award, as well as the evidence supporting each element

of the damages formula that it presented.  Moreover, the jury was instructed that it

---

[1]Also before the Court is Altair and Rampalli's motion for judgment as a matter of law or new trial on counts I and II (Doc. 825) and Altair and Rampalli's renewed motion for judgment as a matter of law and new trial or remittitur on damages. (Doc. 829). These motions are the subject of separate memoranda and orders.

[2]For ease of reference, defendants will be collectively referred to as "Altair" except where appropriate to identify Rampalli and Klinger individually.

could consider the "at will" nature of the employment contracts and the length of time
which any solicited employee would have stayed at MSC but for the solicitation, and
that it could award MSC nominal damages if it found that MSC had not proved the
amount of its loss.  The Court must presume the jury followed the instructions by
evaluating all the evidence and awarding MSC 10% of its claimed loss.

### III. The Trial

The trial spanned twenty-six days.  MSC called 18 witnesses in its case in chief.
Altair called ten witnesses in defense.  MSC called three witnesses in rebuttal.
Approximately 200 exhibits, many consisting of multiple pages, were admitted.  The jury
deliberated for three days before rendering its verdict.  Suffice it to say that the jury was
presented with a mountain of documentary evidence and listened to hours of testimony,
both live and by deposition.

### IV. Legal Standard

The motion is brought under Fed. R. Civ. P. 50(b)(3).  In diversity cases, such as
this, Rule 50 motions are subject to"the standard of review used by the courts of the
state whose substantive law governs the action."  Betts v. Costco Wholesale Corp., 558
F.3d 461, 466 (6th Cir. 2009) (quoting Kusens v. Pascal Co., 448 F.3d 349, 360 (6th
Cir. 2006)).

There is no dispute that California law governs MSC's non-solicitation claims
against Klinger and Rampalli and Michigan law governs MSC's tortious interference
claims against Altair.  California and Michigan courts use the term "judgment
notwithstanding the verdict" (JNOV) instead of "judgment as a matter of law."  Taylor v.
Nabors Drilling USA, LP, 166 Cal. Rptr. 3d 676, 684 (Cal. Ct. App. 2014);Brocklehurst

v. PPG Indus., Inc., 123 F.3d 890, 894 n.3 (6th Cir. 1997).  Courts deciding JNOV

motions in California "must accept as true the evidence supporting the jury's verdict,

disregarding all conflicting evidence and indulging in every legitimate inference that may

be drawn in support of the judgment." Taylor, 166 Cal. Rptr. 3d at 684 (quoting Jones

& Matson v. Hall, 66 Cal. Rptr. 3d 872 (Cal. Ct. App. 2007)).  Courts may grant JNOV

motions "only if there is no substantial evidence to support the verdict." Id.  The same

standard applies in Michigan.  Courts must "view[ ] the evidence and all legitimate

inferences therefrom in the light most favorable to the nonmoving party." Genna v.

Jackson, 781 N.W.2d 124, 128 (Mich. Ct. App. 2009).  JNOV motions may be granted

"only when there is insufficient evidence presented to create a triable issue for the jury."

Id. If "reasonable jurors could honestly reach different conclusions regarding the

evidence, the jury verdict must stand." Id.

## V. Analysis

### A. The Non-solicitation Clauses Are Valid and Enforceable

Altair says that Paragraph 12 of MSC's employment contracts with Klinger and

Rampalli which prohibited them from soliciting MSC personnel are void as a matter of

law.  Paragraph 12 provides:

> NON-SOLICITATION.  Employee agrees that during the term of this
> Agreement and for a period of two (2) years after the termination or
> expiration of this Agreement, Employee will not directly or indirectly
> encourage, solicit, attempt to hire as an employee or consultant or
> otherwise attempt to persuade any other employee of the Company to
> leave the employ of the Company.

Altair says that a California Statute, specifically section 16600 of the California

Business and Professions Code, renders the non-solicitation provision void.  Section

4

16600 states:  "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

In Loral Corp. v. Moyes, 219 Cal. Rptr. 836, (Cal. Ct. App. 1985), the California court addressed the issue of whether such a provision is enforceable.  In Loral, the court held that a contract clause restricting the defendant–the plaintiff's former employee–from disrupting, damaging, impairing or interfering with the plaintiff by "raiding" its employees did not violate section 16600.  The court held it did not, noting that the clause which prohibiting an employee raid did not violate § 16600 because the plaintiff's current employees were free to apply for positions with the defendant's new employer so long as they were not recruited by the defendant.  Thus, under Loral, a non-solicitation clause restricting a former employee from recruiting his former colleagues is not void under section 16600.

Despite Altair's arguments to the contrary, Loral is good law.  Indeed, one of the cases it cites, Thomas Weisel Partners LLC v. BNP Paribas, No. C 07-6198 MHP, 2010 U.S. Dist. LEXIS 11626 (N.D. Cal. Feb. 9, 2010) applied Loral in a post-termination employment dispute.  In Thomas Weisel, the court identified five categories of agreements which may implicate a section 16600 violation:

> 1. An employee agrees not to work for competitors for a certain period of time after his employment ends;
> 2. An employee agrees not to solicit his employer's customers or clients for a certain period of time after his employment ends;
> 3. A customer or client agrees not to hire the employer's employees;
> 4. An employee agrees not to solicit his employer's employees; and
> 5. An employee agrees not to hire his employer's employees.

2010 U.S. Dist. LEXIS 11626, at *10-13.

5

In Thomas Weisel, the court, citing section 16600, Edwards v. Arthur Andersen LLP, 189 P.3d 285 (Cal. 2008), and VL Systems, Inc. v. Unisen, Inc., 61 Cal. Rptr. 3d 818 (Cal. Ct. App. 2007), held that agreements in the first, second, third, and fifth categories are void. Citing Loral, the court further found that agreements in the fourth category are valid: "[T]he 'no solicitation' language a la the fourth type of provision here discussed does not violate [§] 16600 . . . ." Id. at *13. The court then invalidated the provision that prohibited hiring the plaintiff's employees, but upheld the provision that prohibited soliciting the plaintiff's employees, stating:

> [T]he court declines [defendant's] invitation to invalidate the entire employment agreement or even the entire non-solicitation provision. To the extent the non-solicitation provision restricts [defendant's] ability to hire [plaintiff's] employees after [defendant] made the transition to another company, it is void. Accordingly, plaintiffs can state a claim for breach of contract based upon [defendant's] alleged violation of the provisions concerning . . . non-solicitation . . . .

Id. at *22-23.

The non-solicitation clauses at issue here fit into the fourth category of agreements. As such, they are valid and enforceable under California law. Other courts have upheld similar clauses. See also Contech Constr. Prods., Inc. v. Blumenstein, No. 1:11cv878, 2012 U.S. Dist. LEXIS 97050, at *51-53 (S.D. Ohio July 12, 2012) (upholding, under Loral, a restriction against "assisting or inducing . . . employees to terminate their employment . . . , whether or not to become employed by [the new employer]").

The cases cited by Altair: (1) Edwards; (2) Fillpoint, LLC v. Maas, 146 Cal. Rptr. 3d 194 (Cal. Ct. App. 2012); and (3) Fields v. QSP, Inc., No. CV 12-1238, 2012 U.S. Dist. LEXIS 78001 (C.D. Cal. June 4, 2012) are inapposite. None of these cases

6

support the conclusion that the non-solicitation clauses at issue here void.  In <u>Edwards</u>,

the validity of employee non-solicitation clauses was not at issue and not decided.  The

noncompetition agreement in <u>Edwards</u> had three parts:

> [1] [F]or eighteen months after release or resignation, you agree not to
> perform professional services of the type you provided for any client
> on which you worked during the eighteen months prior to release or
> resignation.  This does not prohibit you from accepting employment
> with a client.  [2] For twelve months after you leave the Firm, you
> agree not to solicit (to perform professional services of the type you
> provided) any client of the office(s) to which you were assigned
> during the eighteen months preceding release or resignation.  [3]  You
> agree not to solicit away from the Firm any of its professional
> personnel for eighteen months after release or resignation.

<u>Id</u>. at 285 (brackets and numbers added).  However, the plaintiff challenged only the

first two parts, not the third.  Id. at 290.  The court made clear it was not addressing

validity of the restriction against soliciting employees:  "We do not here address the

applicability of the so-called trade secret exception to section 16600, as Edwards does

not dispute that portion of his agreement or contend that the provision of the

noncompetition agreement prohibiting him from recruiting Andersen's employees

violated section 16600."  <u>Id</u>. at 289 n.4.  Thus, this case does not support Altair's

position.

In <u>Fillpoint</u>, the court invalidated a broad covenant not to compete or solicit.

However, the court was analyzing the relationship between Cal. Bus. & Prof. Code §§

16600 and 16601, and, more specifically, the validity of a covenant not to compete in

the context of the sale of a business.  Without addressing <u>Loral</u>, <u>Edwards</u>, or <u>Thomas</u>

<u>Weisel</u>, the court declared an entire covenant void, citing only <u>Strategix, Ltd. v.</u>

<u>Infocrossing West, Inc.</u>, 48 Cal. Rptr. 3d 614 (2006), which "explained the rationale and

7

operation" of § 16601. 146 Cal. Rptr. 3d at 199-00, 203-04. However, MSC's claims have nothing to do with § 16601. As such, Fillpoint is of little precedential value. Loral, not Fillpoint, is the most recent, published, factually analogous case directly addressing MSC's claims, Loral controls. See Standard Fire Ins. Co. v. Ford Motor Co., 723 F.3d 690, 697 (6th Cir. 2013).

In the last case Altair cites, Fields, the court voided six clauses in a restrictive covenant, one of which was an employee non-solicitation clause. However, the court cited only Edwards; it did not address Loral. Id. As stated above, the court in Edwards did not address the impact of § 16600 on employee nonsolicitation agreements. Thus, the holding in Fields is not persuasive.

Significantly, most recently, in Sunbelt Rentals, Inc. v. Victor, 2014 U.S. Dist. LEXIS 14416 (N.D. Cal. Feb. 5, 2014), the court analyzed Edwards, Fillpoint, and Loral in a case where the defendant challenged the validity of an agreement not to solicit his former employer's customers and employees. The court, citing § 16600, Fillpoint, and Edwards, invalidated the customer restriction, but the court, quoting Loral, upheld the employee restriction, stating: "A contractual provision preventing a departing employee from 'raiding' his former employer's employees is 'not void on its face under § 16600.'" Id. at *30.

In short, MSC's non-solicitation clauses are valid and enforceable under California law.[3] Altair is not entitled to set aside the jury's verdict on this ground.

---

[3]A point not mentioned by either party is that Rampalli made virtually the same argument in seeking summary judgment on MSC's nonsolicitation claims. The Court rejected his argument, explaining:
  Rampalli says the non solicitation restriction is void ab initio under

8

B. The Evidence was Sufficient to find Altair Liable for Tortious Interference

1.

Altair argues that MSC did not present evidence to show that (1) Altair had knowledge of the contracts when it interfered with them, (1) Altair's interference was improper, or (3) Altair induced Klinger's and Rampalli's breaches. The Court disagrees. The jury was presented with evidence, both direct and circumstantial, from which they could reasonably conclude that despite actual knowledge of Klinger's and Rampalli's legal obligations to MSC, Altair used Klinger and Rampalli to recruit MSC talent for the express purpose of increasing Altair's business at MSC's expense.

MSC has marshaled the evidence in its response. Attached as Exhibit A is a excerpt from MSC's brief in response to Altair's motion that describes in detail the

---

California Business and Professions Code section 16600: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kinds is to that extent void." Rampalli says the leading California case, Loral, interpreting employee non solicitation agreements, holds that an employee non solicitation agreement can only preclude initial contact; and, anything more places a restraint on trade and is void.

     Rampalli misinterprets Loral. In Loral, the California Court of Appeal held that noninterference promises are not void under California law, since they do not restrict a former employee's ability to work for a competitor; rather the promises only prohibit the former employee from interfering with his former employer's business. Id. at 278 -79, Id. at 843. And, the law does not restrain the former employee from having discussions with a current employee, so long as the former employee does not make the first contact. Id.

     Rampalli concedes "the clear and unambiguous language of the MSC non-solicitation clause only prohibits the listed acts if they are intended to 'persuade any other employee of [MSC] to leave the employ of [MSC].'" Rampalli and Hoffmann's Resp. Doc. at 10. The narrow question is: Did Rampalli persuade any MSC employee to leave MSC? In other words, does solicitation occur when a defendant continues to persuade a co-employee who contacts, but later changes his mind about leaving his employer?

(Doc. 691 at p. 26-27)

9

evidence presented at trial on the issue of Altair's interference.  The evidence will not be repeated here.

Despite this evidence, Altair says it could not have tortiously interfered with any contract because it was not aware of the non-solicitation clauses until April 7, 2006. Not so.  The evidence presented a trial reasonably shows that Klinger expressed concern to Altair about his MSC obligations on January 21, 2006.  Altair's response even before asking about the contract was to tell Klinger not to worry because its lawyers would take care of everything.  From this, the jury could fairly conclude that Altair operated with, in MSC's words, a "shoot-first-and-ask-questions-later mentality."

As to Altair's argument that a tortious interference exists only where a defendant has knowledge of the exact contract terms, it cites no authority.  Indeed, Michigan law requires only that "the expectancy of which the interferer must be aware must be generally specific."  Varlesi v. Wayne State Univ., 909 F. Supp. 2d 827, 850 (E.D. Mich. 2012) (citing multiple cases) (quotations omitted).  Other than the duration of the restriction, the clause that Klinger quoted on January 26th is substantially similar to what MSC quoted on April 7th.  Thus, Altair knew no later than January 26, 2006, that Klinger and Rampalli were contractually precluded from soliciting MSC employees. Altair did not instruct Klinger not to recruit Riedeman, Koerner, and Pertosa.  Instead, Klinger and Dagg exchanged email updates regarding Riedeman on February 7th and 13th.  Klinger and Dagg exchanged an email update regarding Koerner on February 7th, after which Klinger followed up with Koerner on February 7th, 8th, 9th, and 15th. When Pertosa rejected Altair's first offer on February 6th, Dagg contacted Klinger, told him that he would increase Pertosa's offer, and asked Klinger for "any advice" he could

10

give.  Five days later, Pertosa reached out to Klinger to discuss a "tempting offer" from Altair.  After these events, Riedeman, Koerner, and Pertosa all joined Altair.  Drawing all inferences in favor of MSC, a reasonable jury could and did find that Altair used Klinger to recruit Riedeman, Koerner, and Pertosa in violation of his contract with MSC.

The jury could also reasonably conclude that Altair used Rampalli to recruit McDevitt and Krueger.  Brancheau admitted that Altair knew of Rampalli's non-solicitation obligations when Rampalli approached Scapa regarding McDevitt, but Scapa encouraged Rampalli's efforts.  Altair approved Rampalli's pursuit of McDevitt even after McDevitt and Rampalli raised concerns about MSC's non-solicitation clause, reiterating that Altair would protect them at all costs.  Altair also approved of Rampalli's solicitation of Krueger, appointing Rampalli as Krueger's lead recruiter, interviewer, and negotiator. From this evidence, the jury could reasonably find that Altair tortiously interfered with Klinger's and Rampalli's employment contracts.  Altair is not entitled to a judgment as a matter of law on this ground.

2.

Altair also argues that MSC failed to prove improper interference because its actions were motivated by legitimate business interests.  The Sixth Circuit has rejected such an argument.  In <u>Tata Consultancy Servs. v. Sys. Int'l, Inc.</u>, 31 F.3d 416 (6th Cir. 1994), Tata and the defendant, Syntel, competed to provide computer consulting services around the world.  When multiple Tata employees went to work for Syntel, Tata warned Syntel that those employees owed contractual duties to Tata, and that Tata would sue Syntel to stop employee raids.  After a period fo time Syntel resumed its recruitment of Tata employees.  Syntel told Tata employees "Don't worry about it. We

11

have an excellent Personnel Department which can take care of [any legal problems]."
Syntel recruiters also advised Tata employees to use personal addresses, not work
addresses, when communicating with Syntel.

Syntel moved for summary judgment, contending that there was no evidence of
improper interference because Syntel's actions were motivated by legitimate business
interests. The district court granted summary judgment. The Sixth Circuit reversed.
The Sixth Circuit examined Michigan law addressing the propriety element of a tortious
interference claim and concluded that malice could be inferred from lawful actions for
the sole purpose of economic gain, explaining:

> [T]he significance of the body of law we have described is obvious. If
> an employee of Tata approached Syntel about a job, without having
> been solicited to do so by Syntel or anyone acting on its behalf, Syntel
> might well be justified in hiring the applicant whether or not his employment
> contract with Tata had expired. But if the approach came from Syntel and if
> Syntel sought out the Tata employee, in other words, and actively solicited him to
> come to work for Syntel knowing that the employee could not do so without
> breaking an existing contract with Tata, the hiring of the employee away from
> Tata might well be unjustified. Malice could be inferred from the wrongful act of
> inducing breach of the contract, and it would be no defense that Syntel
> acted not out of hatred or ill-will toward Tata, but solely in the interest
> of feathering its own economic nest at the expense of a competitor.
> Indeed, the indirect purpose of . . . benefitting the defendant at the
> expense of the plaintiff would be critical to a finding of malice.

Id. at 425 (quotations omitted). Further, the Sixth Circuit, citing Jim-Bob, Inc. v.
Mehling, 443 N.W.2d 451 (Mich. Ct. App. 1989), and Wilkinson v. Powe, 1 N.W.2d 539
(Mich. 1942), said that "there can be no categorical answer to the question of what will
constitute justification [for the defendant's conduct], and it is usually held that this
question is one for the jury." Id. at 427 (quotations omitted).

Here, as in Syntel, Altair targeted specific MSC personnel for hire and used

12

Klinger and Rampalli to assist them for the purpose of enhancing Altair's economic position. Altair's "motivation' was a question of fact for the jury, which the jury decided in favor of MSC. The jury's verdict was reasonable based on the evidence presented at trial; Altair is therefore not entitled to judgment as a matter of law.

## C. Altair Was Not Prejudiced When the Court Reinstated Some of MSC's Tortious Interference Claims

Altair says it is entitled to judgment as a matter of law because it was denied notice and an opportunity to defend itself against tortious interference claims, which, according to Altair were revived on April 3, 2014, when the Court, during the trial, denied Altair's motion to preclude MSC from amending its pleadings (Doc. 790). Specifically, defendants argue that "there was substantial prejudice" in having the jury decide whether Altair tortiously interfered with Klinger's non-solicitation obligations as to Koerner and Pertosa, and whether Altair tortiously interfered with Rampalli's nonsolicitation obligations as to McDevitt and Krueger.

MSC says that Altair was not prejudiced because the Court correctly found that these claims were consistent with the proofs and would be submitted to the jury. To support its contention, MSC has outlined the multiple occasions during the trial where Altair confirmed that it was on notice of MSC's claims, did not object to MSC's evidence supporting them, and/or presented evidence in its own defense. Attached as Exhibit B is an excerpt of MSC's brief in response to Altair's motion in which it details, by date, the instances where Altar was on notice as to the scope of MSC's non-solicitation claims.

Altair, however, says is was substantially prejudiced in being denied an

13

opportunity to defend itself. The record simply does not support its assertion. Altair was not denied an opportunity to defend MSC's tortious interference claims as to Klinger's solicitation of Pertosa and Koerner given that Dagg's testimony regarding Altair's recruitment of Pertosa, Koerner, and other MSC employees consumed over multiple pages of trial transcript. (See Trial Tr. Vol. 18 at 46:22-79:22.) After Altair knew on April 3rd that the jury would decide the reinstated claims, defendants addressed Altair's motive for pursuing MSC employees in their closing argument on April 7th.

Moreover, in its response to Defendants' Motion to Preclude MSC from Amending its Pleadings (Doc. 790), which MSC filed the day before Altair rested their case, MSC argued that, under Rule 54(b) of the Federal Rules of Civil Procedure, the Court had the power to reinstate previously disposed claims, particularly when the evidence introduced at the trial of the remaining claims cast doubt upon the validity of the prior ruling. In denying Altair's motion, the Court credited MSC's version as to the proofs presented on these claims.

The Court's decision does not entitle Altair to judgment as a matter of law. Indeed, the Sixth Circuit, relying on Rule 54(b), has upheld a post-trial reversal of summary judgment where the opposing party had notice and an opportunity to be heard on the issue:

> Once a district judge issues a partial summary judgment order removing certain claims from a case, the parties have a right to rely on the ruling by forbearing from introducing any evidence or cross examining witnesses in regard to those claims. If, as allowed by Rule 54(b), the judge subsequently changes the initial ruling and broadens the scope of the trial, the judge must inform the parties and give them an opportunity to present evidence relating to the newly revived issue.

14

Failure to do so might in some circumstances cause substantial prejudice. Huss v. King Co., 338 F.3d 647, 651 (6th Cir. 2003) (quoting Leddy v. Standard Dry Wall, Inc., 875 F.2d 383, 386 (2d Cir. 1989)). See also Venture Indus. Corp. v. Autoliv ASP, Inc., 196 F. App'x 894, 898 (6th Cir. 2006) (affirming a mid-trial reversal of an in limine ruling where the parties could still introduce evidence).

While Altair says it would have tried the case differently, and offers multiple hypothetical scenarios, it misses the point that much of the evidence supporting MSC's tortious interference claims against Altair either supports or refutes MSC's breach of non-solicitation claims against Klinger and Rampalli. For instance, Altair says it would have called Blake to testify as to her communications with Rampalli regarding his contractual obligations. As MSC points out:

> First, Ms. Blake's testimony would be as relevant as to MSC's claim against Rampalli as it would be the MSC's claim against Altair, et Defendants did not call her in defense of Rampalli. Second, Koerner and Pertosa's testimony would be as relevant to MSC's claim against Klinger as it would be to MSC's claim against Altair, yet Defendants did not call them in defense of Klinger, despite listing Pertosa as their first "May Call" witness. Third, Defendants **did** ask Dagg if he tried to persuade Klinger to recruit Koerner and Pertosa. Fourth, both Ms. Palo and Ms. Smith started working for Altair four years after Krueger–the final solicited MSC employee– was hired, so neither has personal knowledge of Altair's recruitment of Koerner and Pertosa through Klinger, or Altair's recruitment of McDevitt and Krueger through Rampalli.

(Doc. 856 at p. 35, 36).

In short, Altair has not shown that it suffered any prejudice that would justify the Court setting aside the jury's verdict and granting it judgment as a matter of law as to the non-solicitation claims under Count IV.

### D. The Jury was Entitled to Award MSC More than Nominal Damages

Altair says that "no reasonable jury could have awarded more than nominal

damages as a matter of law."  Altair then cites Health Call of Detroit v. Atrium Home &

Health Care Servs., Inc., 268 Mich. App. 83 (2005) for the proposition that MSC failed

to present a "tangible basis" to support its damages claims.  Second, Altair says that

MSC failed to establish causation.  Neither argument carries the day.

In Health Call, the Michigan Court of Appeals rejected the rule limiting plaintiffs to

nominal damages for tortious interference with at-will contracts:

> [A] blanket rule limiting recovery to nominal damages as a matter of
> law in all actions arising out of or related to the termination of at-will
> contracts is not legally sound. There may exist factual scenarios in
> which there is a tangible basis on which future damages may be
> assessed that is not overly speculative despite the at-will nature of the
> underlying contract.

268 Mich. App. at .2d at 85-6.

Here, MSC presented a basis for its claimed damages.  MSC asked the jury to:

(1) take each solicited employee's salary; (2) multiply it by four to account for MSC's

return on investment for one year; and (3) multiply the product of (1) and (2) by two to

account for the years that Klinger and Rampalli were precluded from soliciting MSC

personnel.  To establish the salary amounts, MSC called its Vice President for

Development, Douglas Neill, as a witness.  Neill, who had reviewed MSC's Human

Resources data, told the jury the amount that Pertosa, Koerner, Riedeman, McDevitt,

and Krueger had been paid in their last year of employment with MSC.  He also testified

that each solicited employee was a senior software developer with more than seven

years of experience.

To establish the multiple of four representing MSC's reasonable estimate of its

return on investment, Neill testified that he is responsible for MSC's software

16

development costs, he prepares MSC's annual expense budgets, and, therefore, he has personal knowledge of the relationship between development costs and MSC's return on investment. Neil explained that each year MSC invests in development approximately 20% of the amount that it expects to generate in revenue, meaning that for every $1 that MSC invests in development, MSC expects to earn $5. Altair does not challenge the evidence regarding the solicited employees' salaries. Nor do they challenge MSC's 1-to-5 development-to-revenue ratio. Thus, the first two elements of MSC's damages formula, and the evidence establishing them, are not undisputed.

Altair does however challenge the two-year multiplier, claiming that MSC did not prove causation. Under Michigan law, "he issue of causation is generally a question of fact to be decided by the jury." Hold It Prods. Corp. v. Textus Int'l, Inc., No. 201847, 1998 Mich. App. LEXIS 1956, at *6-10 (Mich. Ct. App. July 21, 1998). Here, MSC presented sufficient evidence for the jury to conclude that there was a causal connection between Klinger, Rampalli, and Altair's conduct and the departures of Riedeman, Koerner, Pertosa, McDevitt, and Krueger.

As for the purported lack of evidence regarding the amount of time that each solicited employee would have stayed at MSC but for Klinger, Rampalli, and Altair's misconduct, the jury was properly instructed to consider the "at-will" nature of the solicited employees' contracts when computing damages:

> In determining the damages caused by Altair' interference, you may take into account each employee's "at will" employment status, and may consider how long you believe that employee would have continued to be employed by MSC in the absence of Altair'|s interference.

Altair did not object to this instruction. The Court must presume the jury followed

17

it.  Because the jury awarded MSC only 10% of the claimed loss, a logical conclusion is that the jury did consider the "at-will" nature of the contracts and decided that the solicited employees would not have stayed at MSC for two years.  In short, the jury's damage award was reasonable and based on the evidence offered at trial.

## VI.  Conclusion

For the reasons stated above, the non-solicitation clauses are valid under California law.  MSC also presented sufficient evidence from which a reasonable jury could, and did, conclude that Klinger and Rampalli breached their non-solicitation obligations and Altair tortiously interfered with the same.  Altair is not entitled to judgment as a matter of law.  Accordingly, its motion is DENIED.

SO ORDERED.

_____
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated  9/23/14
      Detroit, Michigan

18

EXHIBIT A
2:07-cv-12807-AC-MKM   Doc # 921   Filed 09/23/14   Pg 19 of 28   Pg ID 41319
2:07-cv-12807-AC-MKM   Doc # 856   Filed 06/10/14   Pg 18 of 43   Pg ID 37093

- On Oct. 12, 2005, Altair interviewed Pertosa but did not offer him a job because it had no "business case" for hiring him. (**Ex. 3**, PX504, at 1.)

- On Dec. 9, 2005, Klinger contacted Quigley about a job at Altair. (**Ex. 4**, PX515, at 2.)  Quigley forwarded Klinger's email to Dagg, Brancheau, and others writing, "It's raining MSC guys :-)" (*Id.*)  Dagg added Scapa to the distribution list and instructed Quigley to set up a meeting with Klinger to "get the inside line" at MSC. (*Id.* at 1.)  Quigley replied by "wonder[ing] [if] Stephan Koerner is also looking to depart." (*Id.*)  Scapa chimed in to say that Altair "cannot hire all of them at once," but that things were "getting interesting." (*Id.*)

- On Dec. 12, 2005, Klinger contacted Dagg about a job at Altair because he had not heard back from Quigley. (**Ex. 5**, PX768, at 1.)  Dagg then set up the meeting that Altair's senior management had discussed three days earlier. (*Id.*)

- On Dec. 22, 2005, Dagg and Quigley met Klinger for lunch. (**Ex. 6**, PX524, at 1. *See also* **Ex. 7**, PX525, at 3-4.)  At that meeting, Klinger, Dagg, and Quigley discussed Pertosa and Koerner, whom Quigley described as "disgruntled leads" whom Klinger would "forward . . . to [Dagg] and [Quigley]." (*Id.* at 4.)  After the meeting, Klinger sent Koerner a note and forwarded Koerner's personal email address to Dagg. (**Ex. 6**, PX524, at 1.)

- On Dec. 23, 2005, Scapa emailed Bob Ryan, a former MSC executive whom Altair had hired as a consultant, advising Ryan that Klinger had "mentioned some other names he sees as very valuable." (**Ex. 8**, PX521, at 1.)  That same day, Koerner sent Klinger an email thanking Klinger for his "inquiry about other opportunities" for Koerner. (**Ex. 9**, PX770, at 1.)

- On Jan. 6, 2006, Altair formally interviewed Klinger, at which time Klinger mentioned that "Riedeman would be a good hire." (**Ex. 6**, PX524, at 1-3.)

- On Jan. 9, 2006, Klinger thanked Dagg for the interview and advised Dagg that Klinger told Koerner that Dagg never got Koerner's email. (*Id.* at 2 & 4.)  Dagg responded by telling Klinger that:  (i) Altair is "re-thinking [its] original budget;" (ii) "Scapa is considering how much he's willing to stretch, if any;" and (iii) Scapa "has asked that we show him the whole plan before moving forward." (*Id.* at 3.)  Dagg then adds that "in a week or two [Altair] should know how many positions [it] can create.  You're on the list." (*Id.*)  He concludes with an update regarding his communications with Koerner. (*Id.*)

- On Jan. 10, 2006, in response to Dagg's request for Riedeman's contact information, Klinger described Riedeman as the "holy grail," gave Dagg

11

Riedeman's work email, and offered to get Riedeman's private email. (*Id.* at 2-3.) Dagg then requested Riedeman's "private email." (*Id.* at 2.) Five hours later, Dagg reported to Brancheau that he had Riedeman's personal email address and had "sent him an invitation to contact me." (**Ex. 10**, PX529, at 2.)

- On Jan. 11, 2006, Dagg described Riedeman as MSC's "crown jewel code slinger." (*Id.* at 1.)

- On Jan. 16, 2006, Klinger reported to Dagg that he just had a long talk with Riedeman, that Riedeman received Dagg's email, and that Riedeman "is worth pulling out all the stops to try and get. He would be an incredible asset to the team. This guy is worth probably 5 normal developers, maybe more. Of course, this assumes that you can bring me aboard too . . . otherwise he's no good and not worth the trouble :)" (**Ex. 6**, PX524, at 6.) Dagg responded, "I was hoping Tom could do the work of 6 guys, but I'll take what I can get." (*Id.*)

- On Jan. 19, 2006, Klinger asked Dagg if Riedeman "has gotten back with you yet" and told Dagg that Riedeman "may take some time . . . and [is] possibly a phase 2 type acquisition." (*Id.* at 7.) Klinger then asked Dagg for "[a]ny update you can share regarding the status of my consideration at Altair[.]" (*Id.*)

- On Jan. 20, 2006, Dagg told Klinger that Altair would be making him a formal offer. (*Id.* at 7. *See also* **Ex. 11**, PX535, at 1.)

- On Jan. 21, 2006, Klinger emailed Dagg saying, "One concern I've had all along is that MSC might decide to pull some legal shanangans [*sic*] and decide to sue me for non-compete issues. . . . [I]f that does happen, could I use Altair's lawyers and resources to help me through it?" (*Id.* at 2.) Three hours later, Dagg responded: "We defend our employees. We have good lawyers. :) Are you currently bound by any contractual clauses we should be aware of that could be an issue?" (*Id.*)

- On Jan. 22, 2006, Klinger – keenly aware of his legal obligations to MSC – emailed Koerner to ask if he had "had a chance to chat with James Dagg yet regarding the possibilities at Altair." (**Ex. 9**, PX770, at 3.) Koerner responded that he had spoken with Dagg, but that he was "genuinely torn" about leaving MSC. (*Id.* at 3.)

- On Jan. 26, 2006, Klinger – still concerned about his legal obligations to MSC – emailed Dagg, quoting verbatim an MSC non-solicitation clause and asking

12

Dagg for his thoughts. (**Ex. 11**, PX535, at 7.) Not even two hours later, Dagg replied, advising Klinger that the clause was "pretty standard," and that he would "pass [it] on to HR for advisement." (*Id.* at 7.) Dagg then referred the issue to Altair's counsel. (**Ex. 12**, Trial Tr. Vol. 18, 85:15-86:1.) That night, Dagg sent Klinger an email entitled, "To worry or not to worry," downplaying the significance of the clause:

> I don't think the solicitation clause is of any concern if there hasn't been any open, obvious solicitation. Relaying a personal email address or talking discreetly in general terms about the opportunities at Altair shouldn't be a cause to worry.
>
> Now I on the other hand, can solicit all I want.  ;)

(*Id.* at 86:2-4; **Ex. 11**, PX535, at 8.)

- On Jan. 27, 2006, Dagg sent Altair's senior management "[a] quick update on recent contacts," including Koerner, Riedeman, and Pertosa. (**Ex. 13**, PX540, at 1.) Scapa responded: "You now think we can get [T]om [Riedeman]? This is great!  Any interesting details?" (*Id.*) Klinger later told Dagg that he had "submitted [his] 2 weeks notice today," but that MSC made it his last day. (**Ex. 14**, PX775, at 1.) Dagg expressed concern that MSC knew Klinger was going to Altair: "Did you mention Altair?  Just curious if that was what specifically triggered the abrupt farewell or is that just a general policy?  With several others in discussions right now, things could get really weird over there." (*Id.*)

- On Feb. 6, 2006, Pertosa turned down a job offer from Altair. (*Id.* at 2.)

- On Feb. 7, 2006, Klinger emailed Dagg "want[ing] to know if there has been any more movement in getting some of the other guys to jump ship at MSC?" (*Id.* at 2.) Klinger specifically asked for an update regarding Riedeman and told Dagg that when Klinger last spoke with Koerner, "[Koerner] was on the fence and one day he'd be positive he wanted to leave and the next, he wasn't so sure." (*Id.*)  Fifteen minutes later, Dagg reported that:  (i) Riedeman was coming in for an interview in two days; (ii) Dagg had spoken with Koerner "a lot" but that Dagg "need[ed] him to talk with someone who he might work with very closely" before Altair would make an offer; and (iii) Pertosa had just rejected Quigley's offer, but that Dagg was "not taking no for an answer so easily. :)" (*Id.*)  Altair was "puzzled" by Pertosa's response, so Dagg requested assistance from Klinger:  "Any advice you may have is sure welcome." (*Id.*) That night, Koerner emailed Klinger from "the land of indecision ;-)" and asked

13

Klinger if Koerner could "shoot over tomorrow around noon. Maybe clear-up some mud." (**Ex. 9**, PX770, at 5-6.)

- On Feb. 8, 2006, Klinger and Koerner met in person. (*Id.* at 6-9.)

- On Feb. 9, 2006, Klinger asked Koerner, "How did your call go today?" (*Id.* at 9-10.) Koerner responded, "As to the troy [*sic*] connection. The gentlemen with whom I'm to speak won't be available until Monday and wishes to speak in person. So stay tuned." (*Id.* at 10.)

- On Feb. 12, 2006, Pertosa asked Klinger for advice because Pertosa was "in the process of evaluating pros and cons" of Altair's offer; had "concerns . . . about the MView product itself," particularly Altair's "leverage . . . in the auto community;" and had "some reservation about leaving msc [*sic*] . . . ." (**Ex. 15**, PX776, at 1-2.)

- On Feb. 13, 2006, Klinger asked Dagg for an update regarding Altair's pursuit of Riedeman. (**Ex. 14**, PX775, at 3.)

- On Feb. 15, 2006, Klinger told Koerner that "Pertosa had changed his mind [and] has decided to accept Altair's offer." (**Ex. 16**, PX771.) Klinger then asked Koerner, "How's your pendulum today?" (*Id.*) Koerner replied, "Pendulum has continued to point to Troy." (*Id.*)

- On Feb. 20, 2006, Dagg reported to Scapa that Riedeman was reluctant to accept Altair's offer. (**Ex. 17**, PX875.)

- On Mar. 1, 2006, MSC sent Altair a letter demanding that Altair "immediately cease and desist from any efforts to target MSC employees as potential recruits." (**Ex. 18**, PX551.) MSC advised Altair that MSC employees were prohibited from "soliciting employees, directly or indirectly, from terminating their employment agreement with MSC," and warned Altair that "[a]ny effort by a former MSC employee to directly or indirectly induce a current employee is actionable – and if Altair participates in such effort, then it is actionable as tortuous [*sic*] interference with a contract." (*Id. See also* **Ex. 19**, Mongelluzzo Dep. Tr., at 167:11-168:22.)

- On Mar. 28, 2006, Koerner left MSC. (**Ex. 9**, PX770, at 13-14.)

- On Mar. 31, 2006, Riedeman accepted an offer from Altair. (*Id.* at 15-17.)

14

- In July 2006, Rampalli joined Altair. (**Ex. 20**, Trial Tr. Vol. 21, at 37:16-17.)

- On Jan. 16, 2007, Rampalli told Scapa and Brancheau that Altair "should try to get" McDevitt. (**Ex. 21**, PX570, at 1.) Rampalli called McDevitt his "replacement" at MSC, describing him as "an absolute superstar." (*Id.*) Rampalli wanted to discuss McDevitt with Scapa and Brancheau because he was concerned about "MSC's possible reaction." (*Id.* at 2.)

- On Jan. 26, 2007, Scapa approved Rampalli's pursuit of McDevitt after Rampalli suggested that Altair do anything it could "to show a high level of interest" to persuade McDevitt to join Altair. (**Ex. 22**, PX571, at 1.)

- On Feb. 2, 2007, Rampalli arranged McDevitt's interview at Altair. (**Ex. 23**, PX601, at 2-3.)

- On Feb. 6, 2007, McDevitt interviewed at Altair. (*Id.* at 2-4.)

- On Feb. 7, 2007, Rampalli forwarded Altair's benefits-related information to McDevitt. (*Id.* at 4.)

- On Feb. 9, 2007, Rampalli, at McDevitt's request, conferred with Altair's legal department regarding "any legal issues that might arise for you, me or Altair should [McDevitt] decide to come [to Altair]." (**Ex. 24**, PX602, at 1.) Rampalli advised McDevitt that "Altair will do whatever is necessary to protect me should MSC decide to become difficult. I told [legal] about our contract and your subsequent visit to Altair; [legal] agreed that I had not broken my agreement with MSC." (*Id.*)

- On Feb. 10, 2007, a "little bird" dropped off McDevitt's Altair offer. (*Id.* at 2.)

- On Feb. 15, 2007, McDevitt told Rampalli that he was "having cold feet towards leaving MSC." (*Id.* at 2.) Rampalli offered to speak with McDevitt regarding his decision. (*Id.* at 2-3.)

- On Feb. 22, 2007, Altair prepared a PowerPoint presentation in which Krueger is identified as the "Program Manager" for a project to begin on July 1, 2007, and is listed as the first name under the heading: "Interview new hires with intent to hire." (**Ex. 25**, PX844, at 4 & 6.) That same day, Altair pitched its products to Toyota, touting its "[u]nmatched experience in MBD" and listing

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

seven developers, all of whom were former MSC employees, including Riedeman, Pertosa, and Koerner. (**Ex. 26**, PX640, at 27.)

- On Mar. 8, 2007, Rampalli requested permission from Scapa and Brancheau to add Krueger to the Altair team, but wanted "to keep the news about Mark between the three of us." (**Ex. 27**, PX574, at 1-2.)

- On Mar. 12, 2007, Rampalli forwarded Krueger's resume to Scapa and Brancheau, describing three different Altair positions for Krueger. (*Id.* at 1.)

- Rampalli arranged Krueger's interviews and negotiated the offer that Krueger ultimately accepted. (**Ex. 28**, Trial Tr. Vol. 6, at 134:18-139:8.)

- **February 12**

  o Altair did not object to MSC's opening statement (i) identifying by name the five MSC employees "who were solicited and hired by Altair after or with the assistance of one or more of the individual defendants," (ii) describing Altair's "plan to hire away highly regarded developers over at MSC and use them to develop their MotionSolve product so it could match ADAMS, so it could compete with ADAMS, and could take away critical customers like Toyota," and (iii) previewing the evidence of Altair's complete disregard for MSC's non-solicitation clause: "Mr. Klinger, tell me whatever you want, who I should go after, how I should go after him, and I'll do the soliciting. In other words, we'll do this indirectly. We won't do it directly. I'll be the front person, but you are behind the scenes giving me information." (**Ex. 32**, Trial Tr. Vol. 1, at 25:22-27:21 & 31:14-33:10.)

- **February 20**

  o Altair did not object when its CEO, James Scapa, confirmed that, as part of Altair's "strategy," he "didn't just hire MSC employees," but that: (i) he "instructed [his] managers to pursue the leads that . . . Mr. Klinger had identified;" (ii) he "continued to monitor the progress of their hires;" and (iii) he "wanted to be kept apprised and in the loop as to the status of what was happening in terms of bringing onboard to Altair the MSC employees." (**Ex. 33**, Trial Tr. Vol. 5, at 32:18-34:12; **Ex. 13**, PX540.)

  o Scapa also confirmed, without an objection from Altair, that: (i) he did not recall whether he ever suggested that Rampalli should not be trying to solicit directly his former MSC colleagues, including McDevitt and Krueger; (ii) he did not recall whether he told Rampalli to stop forwarding leads on MSC personnel; and (iii) he never referred Rampalli to Altair's Human Resources department. (**Ex. 33**, Trial Tr. Vol. 5, at 45:1-48:24; **Ex. 21**, PX570; **Ex. 22**, PX571; **Ex. 27**, PX574.)

- **February 24**

  o Without an objection from Altair, MSC introduced testimony and exhibits showing that McDevitt expressed concern about Rampalli's non-solicitation obligation and that Rampalli expressed concern about "MSC's possible reaction" to his recruitment of McDevitt, but that Scapa, Brancheau, and Altair's legal department "gave [Rampalli] the thumbs up or the go-ahead"

to pursue McDevitt and "reiterated that Altair will do whatever is necessary to protect [Rampalli] should MSC decide to become difficult." (**Ex. 28**, Trial Tr. Vol. 6, 123:3-134:17; **Ex. 21**, PX570; **Ex. 23**, PX601, at 2 & 4; **Ex. 24**, PX602.)

o Without an objection from Altair, MSC also introduced testimony and exhibits showing that: (i) weeks before Krueger contacted Rampalli about potential job opportunities, Altair had prepared a presentation identifying Krueger as one of two MSC targets to "[i]nterview new hires with intent to hire;" and (ii) Altair ultimately appointed Rampalli to recruit Krueger and negotiate his salary. (**Ex. 28**, Trial Tr. Vol. 6, 134:18-139:8; **Ex. 27**, PX574; **Ex. 25**, PX844, at 4 & 6.)

- **March 6**

  o When MSC moved to conform its claims to the proofs presented during its case-in-chief, revised with the Court its draft verdict form, and confirmed that it had a *prima facie* case for tortious interference against Altair regarding Klinger's solicitation of Riedeman, Koerner, and Pertosa, and regarding Rampalli's solicitation of McDevitt and Krueger, Defendants disagreed "with Mr. Hickey's assertion of what the claims are at this point, because they do differ from what was the case after the rulings of Judge Roberts." (**Ex. 34**, Trial Tr. Vol. 13, at 98:11-24, 101:22-102:13, 104:11-15, 108:21-109:20 & 111:8-25.)

- **March 10-21**

  o The Court adjourned trial for two weeks. At that point, Altair, which knew that MSC's position regarding the claims presented "differ[ed] from what was the case after the rulings of Judge Roberts," had ample opportunity to prepare its defense to those claims. (*Id.* at 104:11-15.) In fact, Defendants identified what they characterized as "significant problems" with the March 6th verdict form, including "the claim in Count IV against Altair with respect to Mr. Rampalli's alleged solicitation of Todd McDevitt and Mark Krueger." (**Ex. 35**, 03/17/14 email.)

- **March 24**

  o Altair did not object, respond to, or otherwise address in its own reopening this statement from MSC's reopening: "Altair tortiously interfered with all

of these contracts by knowing the contracts existed then going after these individuals by using Mr. Rampalli, by using Mr. Klinger . . . to get them. Even if they didn't do it directly, Altair said that we can do it indirectly. There is nothing preventing us from doing it. You just give us all of the information." (**Ex. 31**, Trial Tr. Vol. 15, at 19:9-23 & 34:11-37:17.)

o During their direct examination of James Brancheau, Altair's former CTO and current member of Altair's Board of Directors, Defendants questioned Brancheau about Altair's staffing decisions regarding Pertosa, Krueger, McDevitt, and Koerner. (*Id.* at 67:16-70:21.)

o Altair never once objected when MSC cross-examined Brancheau and confirmed that: (i) Altair had notice of Rampalli's non-solicitation obligation months before he recruited McDevitt and Krueger; (ii) Altair did not remind Rampalli of his non-solicitation obligation when he requested permission from Brancheau and Scapa to recruit McDevitt and Krueger; and (iii) Altair never instructed Rampalli not to recruit McDevitt and Krueger. (*Id.* at 88:24-92:16 & 98:2-99:19.)

- **March 25**

  o In a Motion to Preclude MSC from Amending Its Pleadings, Defendants challenged MSC's attempt to conform its claims, including Count IV, to the proofs presented. (R. 790.)

- **March 26**

  o In a Motion and Memorandum for Judgment as a Matter of Law Pursuant to Rule 50(A), Defendants denigrated MSC's extended March 6th verdict form colloquy with the Court as a *sub silentio* motion for reconsideration of the scope of Count IV. (R. 794, at 32 n.16.)

  o Defendants called Altair's current CTO, James Dagg, to testify about "how we have hired some of the people at our company." (**Ex. 36**, Trial Tr. Vol. 17, at 111:9-112:6.)

- **March 27**

  o ***Defendants*** specifically asked Dagg if he induced Klinger to breach his non-solicitation obligations by recruiting Pertosa and Koerner:

24

Q: Okay. Did you ever ask Mr. Klinger if he would persuade Mr. Pertosa to leave MSC and join Altair?

A: No, I did not.

* * *

Q: Now, did you ever ask . . . Mr. Klinger to try to persuade Mr. Riedeman, Mr. Pertosa, or Mr. Koerner to come to work for Altair Engineering?

A: No, I didn't ask him to persuade anybody.

* * *

Q: Did you ask Mr. Klinger to try to persuade Mr. Pertosa?

A: No, I did not.

(**Ex. 12**, Trial Tr. Vol. 18, at 54:25-55:2, 70:18-21 & 77:17-18.)[5]

- **March 28**

o Altair never objected to MSC's cross-examination of Dagg regarding (i) Klinger's concerns about his MSC non-solicitation clause, (ii) Altair's decision to make Pertosa an offer only after Klinger described him as "a fabulous resource" whom "he would pick," (iii) Dagg's request for advice from Klinger regarding Pertosa, or (iv) Altair's touting its recent acquisition of MSC talent, including Pertosa and Koerner. (**Ex. 29**, Trial Tr. Vol. 19, at 18:3-27:15, 43:4-59:18 & 73:17-75:11; **Ex. 4**, PX515; **Ex. 11**, PX535, at 1-2 & 7-8; **Ex. 26**, PX640, at 27; **Ex. 14**, PX775.)