UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MSC.SOFTWARE CORPORATION,

    Plaintiff,

v.

ALTAIR ENGINEERING, INC.,

    Defendant.
_____/

Case No. 07-12807

HON. AVERN COHN

**MEMORANDUM AND ORDER**
**OVERRULING MSC'S OBJECTIONS (Doc. 1108) AND**
**ADOPTING REPORT AND RECOMMENDATION OF SPECIAL MASTER (Doc. 1102)**
**AND**
**DENYING MSC'S MOTION IN LIMINE TO EXCLUDE CHRISTOPHER VELLTURO**
**(Doc. 993)[1]**

I.

This is a business dispute tried to a jury. The Court set aside a jury's $26,100,000.00 verdict in favor of MSC and granted Altair a new trial on the issue of damages for breach of confidentiality/misappropriation of three MSC-owned technical trade secrets (TTS).

Following the Court's ruling, the parties engaged in damages discovery which included the filing of expert reports. MSC filed a motion in limine to exclude the report and testimony of Dr. Christopher A. Vellturo (Doc. 993), Altair's damages expert. The Court referred the matter to the Special Master for a report and recommendation (Doc.

---

[1] Upon review of the parties' papers, the Court deems this matter appropriate for decision without oral argument. See Fed. R. Civ. P. 78(b); E.D. Mich. LR 7.1(f)(2).

1010). The Special Master recommends that the motion be denied. (Doc. 1102). MSC objects. (Doc. 1108). For the reasons that follow, MSC's objections will be overruled, the Special Master's report will be adopted and MSC's motion to exclude Vellturo will be denied.

II.

The matter has been fully and robustly briefed. The relevant papers are as follows:

| | |
|---|---|
| Doc. 993 | MSC's motion to exclude Vellturo |
| Doc. 1010 | Order of reference to Special Master |
| Doc. 1020 | Altair's response |
| Doc. 1087 | MSC's reply |
| Doc. 1087 | Altair's surreply |
| Doc. 1102 | Special Master's Report and Recommendation[2] |
| Doc. 1108 | MSC's objections |
| Doc. 1109 | Altair's response |
| Doc. 1156 | MSC's reply |

In addition, the record contains Vellturo's report (Ex. 1 to Doc. 993) and supplemental expert report (Ex. H to Doc. 1020).

III.

A district court must conduct a de novo review of the parts of a special master's

---

[2] The Special Master circulated a draft of his report to the parties for informal comment. MSC provided comments which resulted in the Special Master modifying his report where deemed appropriate.

report and recommendation to which a party objects. 28 U.S.C. § 636(b)(1)(B). The district "court may accept, reject, or modify, in whole or in part the findings or recommendations" of a special master." Id.

The Special Master set forth the proper legal framework for deciding the motion:

> A qualified expert may testify if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.
> The Rule requires the district court to act as a gatekeeper to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993). That standard applies not only to scientific testimony but to all expert testimony. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147 (1999). The reliability inquiry is a flexible one; "whether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." Id. at 153. "[T]he Daubert Court has instructed the courts that they are not to be concerned with the reliability of the conclusions generated by valid methods, principles and reasoning.... If the principles, methodology and reasoning are scientifically valid then it follows that the inferences, assertions and conclusions derived therefrom are scientifically valid as well." Greenwell v. Boatwright, 184 F.3d 492, 497 (6th Cir. 1999) (citing U.S. v. Bonds, 12 F.3d 540, 556 (6th Cir. 1993).
>
> "Daubert and Rule 702 are safeguards against unreliable or irrelevant opinions, not guarantees of correctness." I4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 854 (Fed. Cir. 2010) aff'd 131 S.Ct. 2238 (2011). "When the methodology is sound . . . disputes about the degree of relevance or accuracy may go to the testimony's weight, but not its admissibility." Id. at 852. "Perceived flaws in an expert's opinion go to weight only if they fall within the accepted norms of the discipline and have a non-speculative basis in fact." Multimatic, Inc. v. Faurecia Interior Systems, USA, Inc., 358 Fed. Appx. 643, 654 (6th Cir. 2009). When parties take different approaches, "the relative strengths and weaknesses may be exposed at trial or attacked during cross-examination. Apple Inc. v. Motorola, Inc., 757 F.3d 1286, 1315 (Fed. Cir. 2014). But, expert testimony that is not grounded in "sufficient facts or data," or not the product of "reliable principles and methods," as required by Rule 702, is properly excluded as "pure conjecture." Pluck v. BP Oil Pipeline Co., 640 F.3d 671, 679 (6th Cir. 2011).
>
> A disclosed expert's report must contain "a complete statement of all

> opinions the witness will express and the basis and reasons for them" as well as "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii).

(Doc. 1102 at p. 5-7).

## IV.

As the Special Master correctly noted, the Michigan Uniform Trade Secrets Act permits recovery of damages for misappropriation under ane unjust enrichment or a reasonable royalty theory. M.C.L. § 445.1904. Vellturo presented both theories of damages. His conclusions, in summary form, are as follows:

1. MSC has not presented a lost profit-based theory of damages.

2. There is no evidence of any material commercial gain to Altair attributable to the TTS. Unjust enrichment damages are limited to $36,591, based on Altair's cost of designing around and removing the misappropriated code, divided as follows: $8,258 for TTS 1; $20,076 for TTS 2; and $8,258 for TTS 3.

3. Based upon the above assessments, and other foundational opinions, reasonable royalty damages are limited to the most that Altair would have been willing to pay, namely, the unjust enrichment damages figure of $36,591.

The Special Master explained Vellturo's methodology in detail. See Doc. 1102 at p. 13-15. Briefly, Vellturo noted that Altair's MotionSolve product is not sold as a stand-alone product but is part of the HyperWorks software bundle. Before attempting to allocate damages to Altair's use of the three misappropriated TTS that form only a portion of MotionSolve, Vellturo therefore had to find a way to allocate HyperWorks' revenue to MotionSolve. He studied available data on customer usage of MotionSolve. He then treated that software program as if was being used by an Independent Software Vendor ("ISV"). With that assumption, and using Altair's formula for

compensating third party ISVs, he allocated a royalty compensation based on the percentage usage of MotionSolve relative to the other HyperWorks programs. He also computed the frequency with which Altair customers sought assistance from Altair customer service personnel as a measure of their interest in MotionSolve. He further contacted Altair application engineers (AE) to get their qualitative sense of how frequently customers use MotionSolve as compared with other HyperWorks programs. On the basis of these three measures, Vellturo concluded that MotionSolve accounts for only about 0.13% of the leveled usage of HyperWorks and 0.08% of HyperWorks revenue when accounting for the 40% service charge (Id. at ¶88). He also concluded that usage date showed that only 9.6% of all HyperWorks reporting licenses report any MotionSolve usage.

V.

MSC's objections, as Altair points out, essentially repeat the arguments considered and rejected by the Special Master. MSC's objections do not identify any flaws in the Special Master's reasoning or (with one exception) raise any new arguments. Be that as it may, the Court considers each objection in turn below.

A.

MSC first objects to the recommendation that Vellturo's opinions based on conversations with AEs are admissible, contending that such evidence is improper hearsay. The Special Master thoroughly considered MSC's hearsay arguments the first time they were raised and correctly found that the challenged material is "the kind of evidence reasonably relied upon by [economics] experts in measuring damages" and not a basis for exclusion. Doc. 1102 at p. 28-29.

5

MSC also takes issue with the case law relied upon by the Special Master, characterizing the reliance on <u>Bournes, Inc. v. Ryachem Corp</u>., 1999 WL 351131842 (C.D. Ca. Dec. 28, 1998) as "egregious." Doc. 1108 at p. 5. MSC says <u>Bournes</u> and other cases relied upon are distinguishable on the basis that "an economics expert in a patent case could rely on interviews directly with customers as a basis for his damages calculation" and that Vellturo spoke with Altair's employees, not with customers. Doc. 1108 at 5. This objection falls short. The customers in <u>Bournes</u>, as the Special Master explained, had personal experience and observations to relate just as Vellturo's interviewees provided "personal observations" based on their extensive hands-on experience. Doc. 1102 at p. 29. Citing case law, the Special Master correctly noted that "the AEs' statements about their own observations of customer usage, and the occurrence or non-occurrence of customer complaints about removal of MotionSolve features, are the kinds of evidence that an expert in economics may properly rely upon in forming an opinion on the value of the TTS." Doc. 1102 at 31-32. Moreover, the information gathered from the interviews was consistent with the other information considered by Vellturo, including usage logs, call center data, and company records and documents. As the Special Master noted, this consistency is strong evidence of the reliability of all of the data.

MSC's also objects to the conversations themselves. MSC says that none of the persons who Vellturo spoke with will be "forthcoming at trial." Doc. 1108 at p. 10. This is misguided. The Court allowed depositions of any three of Vellturo's interviewees, on top of participant Keshav Sundaresh and Vellturo himself. MSC has already cross-examined these individuals in depositions. MSC has listed all three of its chosen

interviewees and Sundaresh on its witness list.

In its final objection on the issue of AE interviews, MSC says that Vellturo "relied on" an "absence of customer complaints" "to establish the truth of numerous factual propositions." Doc. 1108 at p. 10-12. This objection is not understood. The passages that MSC cites in Vellturo's report (Doc. 1108 at p. 11 (citing Doc. 1076, Ex. 2, Vellturo Report at ¶¶ 6, 29, 30, 59)) make no reference to the "absence of customer complaints," and instead are discussing personal experiences of Vellturo's interviewees, already addressed above. The admissibility of the "absence of customer complaints" is a separate issue, which the Special Master correctly analyzed under Fed. R. Evid. 801. Doc. 1102 at p. 28-29 (citing Fed. R. Evid. 801 advisory committee note to subd. (c) (1972) ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay")).

Overall, MSC's first objection relating to Vellturo's use of AE interviews in forming his opinion does not carry the day. The Special Master correctly concluded that reliance on such evidence is permitted under the rules and does not render his opinion excludable under Daubert.

B.

MSC next objects to the Special Master's recommendation that opinions based on Altair's customer usage data is admissible. In supporting its objection, MSC selectively quotes from the Special Master's report, and does not fairly represent the Special Master's recommendation in context. For example, MSC claims that "The Special Master noted that Vellturo's conclusion was based on 'an absence of evidence

that the reporting license same is biased.'"  Doc. 1108 at p. 13.  MSC omits the Special

Master's fuller observation of Vellturo's methods:

> That conclusion was based in turn on his conclusion that there was an absence of evidence that the reporting license sample is biased, **as well as evidence affirmatively suggesting that such sample is representative with respect to MotionSolve: (1) the percentage of total HyperWorks revenue from reporting licenses increased over time, with no corresponding change in overall percentage usage of MotionSolve within that group; (2) the industry mix of reporting licenses is similar to the mix of non-reporting licenses, suggesting that the same types of licenses are found in both groups (Id. at ¶81**).

Doc. 1102 at p. 17 (emphasis to show omitted portions of Special Master's report).

MSC also takes issue with the thoroughness of the Special Master's report, claiming for example that "the Report and Recommendation does not address a case cited by both parties, GE v. Joiner," Doc. 1108 at p. 15.  Not so.  The Special Master did quote this case.  See Doc. 1102 at p. 18, with the same block quote MSC provides in its objection.  MSC also overlooks the Special Master's correct observation that "MSC does not challenge any portion of Dr. Vellturo's Supplemental Expert Report of October 1, 2015." Doc 1102 at 19.

In short, MSC's objection raises the same arguments it made to the Special Master.  The Special Master discussed MSC's challenges to Vellturo's testimony, and correctly concluded that MSC's criticisms "go to the weight to be given Dr. Vellturo's testimony and conclusions, and are not grounds for exclusion."  Doc. 1102 at 20.

### C.

MSC also objects to the Special Master's recommendation that Vellturo's opinions based on Altair's customer inquiry logging database (the "Spectrum"

8

Data) is admissible. MSC says that the "Special Master … does not evaluate whether Vellturo can reasonably conclude from the dataset that there was 'limited customer usage' of MotionSolve." Doc. 1108 at p. 16. To the contrary—the Special Master did consider the reliability of this evidence and found that Vellturo's analysis "was consistent with the conclusions drawn from independent sources used by Dr. Vellturo." Doc. 1102 at p. 21. Again, MSC's objection goes to the weight of the evidence, not its reliability. MSC can present its alternate explanation as to how to interpret the Spectrum data on cross-examination. This objection lacks merit.

### D.

MSC further says that the Special Master's erred in rejecting its argument relating to Generally Accepted Accounting Principles (GAAP). MSC argued that Vellturo's opinion based on customer usage, rather than price, is not supported by GAAP and Vellturo admitted he did not consider whether his methodology satisfied GAAP. The Special Master found that MSC's argument was "based on several inaccurate, incomplete and misleading underlying representations," Doc. 1102 at 22; and that MSC's representation of Altair's experts was "misleadingly incomplete." Doc. 1102 at 23. The Special Master went on to note, putting aside MSC's inaccuracies, that "GAAP does not control here because its standards do not apply to allocation of revenue from bundled software." Id. at p. 22. Vellturo's customer usage method, while not under GAAP, is, as Altair notes, based on a methodology that is accepted by more than 40 ISV partners." Doc. 1020 at p. 15. Vellturo's methodology is to use the approach that numerous arms-length third party companies have agreed to be paid for their products. The Special Master properly concluded that Vellturo's methodology was

9

reliable and admissible regardless of GAAP:

> Whether Dr. Vellturo, who analyzed the damages as an economist, should have applied a different methodology, prescribed by an accounting standard that is not yet in effect, may be a question relevant to his credibility and the weight to be accorded to his testimony. It does not, in my opinion, affect the reliability and admissibility of his testimony.

(Doc. 1102 at p. 25-26).

E.

MSC objects to the Special Master's finding that Vellturo properly relied on conversation with Sakthivel Subramanian in forming his opinions. MSC once again argues that Vellturo's conversations with Sakthivel Subramanian, a trial witness, render his opinions unreliable. The Special Master addressed this argument, noting that MSC has the opportunity to test the reliability of the information relied on by Vellturo. MSC could cross-examine Subramanian about the trade secret removal process, and MSC has the source code repository where it can verify the changes and dates that Subramanian made his modifications. See Doc. 1102 at p. 32-34. Thus, Special Master concluded that MSC's criticisms are appropriate for cross-examination of Vellturo or Subramanian, and do not undermine the admissibility of Vellturo's opinions. The Court agrees with the Special Master. MSC's objection goes to the weight to be given Vellturo's opinion, not its reliability. This objection fails.

F.

MSC also challenges the Special Master's similar conclusion that Vellturo could rely on the Horstmann report from Altair's technical expert in shaping his opinion. MSC consistently says that Vellturo has "embellished" Horstmann's findings. The Special Master noted that Altair had presented a "detailed chart" collecting evidence to rebut

10

MSC's argument, and recommended that MSC's challenge was an issue for cross-examination at trial, not exclusion of the Report. Doc. 1102 at p. 34-35. This objection clearly goes to credibility, not admissibility, which MSC can fully explore through cross-examination. This objection is overruled.

### G.

MSC also takes issue with the Special Master's comments on burden shifting and whether Altair must apportioning MotionSolve revenue as a reason the exclude Vellturo. MSC provides only a cursory objection "to the Special Master's recommendation on this issue for all the reasons previously submitted to this Court." Doc. 1108 at 22. The Special Master reviewed MSC's briefing, and Dr. Vellturo's report, and recommended that MSC may cross-examine Vellturo on the grounds for his methodology. As MSC, Altair, and the Special Master recognize, the burden-shifting and apportionment issues are still open (and most critical to the Lee Daubert motion). Thus, this not a ground for excluding Vellturo's report.

### H.

MSC says that the Special Master erred in concluding that Vellturo accounted for MSC's position in the hypothetical negotiation. The Special Master noted that Vellturo did, in fact, consider MSC's position and also "explained why it would not have given MSC much leverage in the hypothetical negotiation." Doc. 1102 at p. 37-38. The Special Master correctly concluded that MSC's allegation would be an issue for cross-examination, not a reason to exclude Vellturo's testimony. This objection also fails.

### I.

11

In its final objection, MSC says that Vellturo's findings are not reliable because Altair's customers can allegedly access prior versions of the software that contain the TTS.  The Special Master addressed MSC's arguments in his report.  MSC does not object to the Special Master's recommendation that "MSC's challenge can be readily brought out in cross-examination at trial." Id. at 40.

MSC, however, raises a new argument that "Altair replaced the trade secrets with derivate mechanisms" and that "customers still utilize older versions of MotionSolve." Doc. 1108 at p. 23.  This argument is unavailing.  First, the Court has ruled that the TTS were removed from MotionSolve and MSC presented no evidence to show that derivations continue to exist in the code.  See Doc. 1133.  That should end most of the matter.

With regard to MSC new argument that customers can still use prior versions of MotionSolve, MSC offers scant evidence, in form of two emails.  The emails MSC attached do not support MSC's claim that "Altair's 'large' customer typically utilize older versions of MotionSolve." Doc. 1108 at p. 24, Ex. 2 & 3.  The Ex. 2 email does not even mention MotionSolve. Doc. 1108 Ex. 2.  And with respect to Ex. 3, MSC misrepresents the content of the email—which is discussing Altair's separate MotionView product—to claim that the email concerns MotionSolve, the product at issue in this case.  The original email reads:

> "still using **MV**10.0.160 and hesitant to move to **MV**12.0.110 due to quality concerns after going through a painful 7.0 to 10.0 migration."

Doc. 1108 Ex. 3 at p. 1 (emphasis added to show reference to MotionView (MV))

Tellingly, MSC sets for the email in its brief as follows:

> "still using **[Version 10]** and hesitant to move to **[Version 12]** due to quality concerns after going through a painful 7.0 to 10.0 migration." Ex. 3, ALTAIR304096. Accordingly, Altair's customers still utilize the trade secrets in older versions of **MotionSolve**.

Doc. 1108 at 24 (emphasis added). MSC' omission of the "MV" is misleading and implies, incorrectly, that the version numbers in the email referred to MotionSolve. Putting aside that it is improper for MSC to introduce new evidence at the objection stage, this "evidence" does not advance MSC's position. More importantly, MSC's argument at best goes to weight and not admissibility.

VI.

For the reasons stated above, MSC's objections are OVERRULED. The Special Master's report and recommendation is ADOPTED as the findings and conclusions of the Court, as supplemented above. MSC's motion to exclude Vellturo is DENIED.

SO ORDERED.

S/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated: February 13, 2017
      Detroit, Michigan

13